*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-13-0003065
06-OCT-2016
09:02 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

KILAKILA 'O HALEAKALĀ, Petitioner/Appellant-Appellant,

vs.

BOARD OF LAND AND NATURAL RESOURCES, DEPARTMENT OF LAND AND NATURAL RESOURCES, SUZANNE CASE,[1] in her official capacity as Chairperson of the Board of Land and Natural Resources, and UNIVERSITY OF HAWAI'I, Respondents/Appellees-Appellees.

SCWC-13-0003065

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0003065; CIV. NO. 12-1-3070)

OCTOBER 6, 2016

RECKTENWALD, C.J., NAKAYAMA AND McKENNA, JJ.,
WITH McKENNA, J., CONCURRING SEPARATELY, AND
POLLACK, J., DISSENTING SEPARATELY, WITH WHOM WILSON, J.,
JOINS IN PART, AND WILSON, J., DISSENTING SEPARATELY

---

[1] State of Hawai'i Board of Land and Natural Resources (BLNR) chairperson Suzanne Case was automatically substituted as a respondent/appellee-appellee in place of former BLNR chairperson William J. Aila, Jr., who was sued in his official capacity. Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1) (2010).

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case concerns a conservation district use permit for construction of the Advanced Technology Solar Telescope (ATST) on the island of Maui, in an area at the summit of Haleakalā that was set aside for astronomical observatories in 1961. Haleakalā is a site of great cultural and spiritual importance to the Native Hawaiian community. It also bears scientific significance for astronomical studies, and is a popular visitor destination.

The Board of Land and Natural Resources (Board or BLNR) granted a permit for the University of Hawaiʻi (UH) to construct the ATST.[2] Kilakila ʻO Haleakalā (Kilakila), an organization "dedicated to the protection of the sacredness of Haleakalā[,]" challenged BLNR's approval of the permit to construct the ATST. Kilakila appealed to the Circuit Court of the First Circuit and the Intermediate Court of Appeals, and both courts affirmed BLNR's decision.

This court granted certiorari review. We conclude that the permit approval process was not procedurally flawed by prejudgment because BLNR's initial permit was voided. Nor was it flawed by impermissible ex parte communication because BLNR

---

[2] The ATST has been the subject of much litigation, including Kilakila ʻO Haleakalā v. Bd. of Land & Nat. Res., 131 Hawaiʻi 193, 317 P.3d 27 (2013) (Kilakila I), Kilakila ʻO Haleakalā v. Univ. of Hawaiʻi, 134 Hawaiʻi 86, 332 P.3d 688 (App. 2014), cert. granted, SCWC-13-0000182 (Sept. 12, 2014), which we are deciding today, and the case at bar.

2

removed the original hearing officer after he communicated with a party, and the BLNR Chairperson's meeting with non-parties did not address the merits of the permit approval process.  We further conclude that BLNR validly determined that the ATST met the applicable permit criteria and was consistent with the purposes of the conservation district.

Accordingly, we conclude that BLNR properly granted the permit and affirm the ICA's judgment.

## I.  Background

### A.  Haleakalā, the Haleakalā High Altitude Observatory, and the Proposed Advanced Technology Solar Telescope

The summit of Haleakalā has important cultural significance to Native Hawaiians.  Cultural assessments performed for the ATST determined that the Haleakalā summit is one of the most sacred sites on Maui, and the Haleakalā Crater is known as "where the gods live."  The summit was traditionally used by Native Hawaiians as a place for religious ceremonies, for prayer to the gods, to connect to ancestors, and to bury the dead.  Native Hawaiians continue to engage in some of these practices at the summit.

The Haleakalā summit consists of three volcanic cones, and all are partially developed.  One volcanic cone includes facilities belonging to the County of Maui, the State of Hawai'i, and the federal government.  The second cone houses Haleakalā

3

National Park's popular visitor outlook.  In 1961, Hawai'i

Governor William Quinn set aside 18.166 acres on the third

volcanic cone, Pu'u Kolekole, as the site of the Haleakalā High

Altitude Observatory (HO).  Since this designation by Governor

Quinn, the site has been used for astronomical observatories and

is the only site at Haleakalā used for these purposes.  The HO

currently consists of eight research facilities "for advanced

studies of astronomy and atmospheric sciences" owned by UH and

managed by the UH Institute of Astronomy (UHIfA).

        The HO is located in a conservation district, as

categorized by the State Land Use Commission.  Land within a

conservation district is divided into subzones.  See HAR § 13-5-

10 (1994).  The HO is in a "general subzone," which seeks to

"designate open space where specific conservation uses may not be

defined, but where urban use would be premature."  HAR § 13-5-

14(a) (1994).  Several types of land use are permitted in the

general subzone, including astronomical facilities.  See HAR

§ 13-5-24 (1994) (listing "[a]stronomy facilities under an

approved management plan" as one of the allowable uses in a

resource subzone); HAR § 13-5-25 (1994) (stating that "[i]n

addition to the land uses identified [for general subzones], all

identified land uses . . . for the protective, limited, and

resource subzones also apply to the general subzone, unless

otherwise noted").

Over the past two decades, the proposed ATST was developed through the work of the Association of Universities for Research in Astronomy, the National Solar Observatory, and the National Science Foundation.  Astronomers and other scientists determined that there was a world-wide need for a telescope capable of taking high-resolution images of the sun to study its solar magnetic fields and its relation to solar energy, sunspots, and flares.  No current or planned ground-based or space-based telescope in the world has this capability.  The ATST would consist of an 142.7-feet tall telescope observatory structure, a support and operations building, a utility building, a parking lot, a wastewater treatment plant, and modifications to an existing observatory.  In 2004, after studying 72 potential sites, Haleakalā was chosen as the best site for the ATST because it met or exceeded all requirements.

## B.    Application for Conservation District Use Permit

The ATST requires a conservation district use permit (CDUP) because the HO is located in a conservation district.  On March 1, 2010, UHIfA submitted a conservation district use application (CDUA) to BLNR pursuant to HAR § 13-5-31(a)[3] and HAR

---

[3]      HAR § 13-5-31(a) (1994) details the requirements for a permit application:

> (1) A draft or final environmental assessment, draft or final environmental impact statement, or proof of an exemption or request for an exemption from the chapter 343, HRS, process, as applicable;

(continued...)

§ 13-5-39(a)[4]. The CDUA provided a range of detailed information about the ATST, including a final environmental impact statement (FEIS) and a management plan (MP).

### 1. Final environmental impact statement

The FEIS[5] was completed in July 2009 and addressed the environmental impacts associated with the construction and operation of the proposed ATST Project.[6] The impacts were

---

[3](...continued)
    (2) Associated plans such as location map, site plan, floor plan, elevations, and landscaping plans drawn to scale;

    (3) The proposed land use shall address their relationship with county general plans and development plans;

    (4) Any other information as determined by the department;

    (5) Signature of the landowner;

    (6) Applicable fees;

    (7) A minimum of twenty copies (only one original copy required for site plan approvals) of the application and all attachments.

[4]    HAR § 13-5-39(a) (1994) states, "Where required, management plans shall be submitted with the board permit application[.]" A management plan was required for the ATST because the site is located in a general subzone. See HAR §§ 13-5-24,-25.

[5]    An environmental impact statement is "an informational document . . . which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects." HRS § 343-2 (Supp. 2008).

[6]    The FEIS was completed in accordance with several environmental laws: (1) the Federal National Environmental Policy Act (NEPA) Title 42, U.S.C. § 4321 and 40 CFR Parts 1500-1508, (2) Hawaiʻi Environmental Policy Act (HEPA) HRS § 343 and HAR § 11-200, and (3) BLNR's requirement for an EIS to obtain a CDUP under HAR § 13-5-31(a)(1). The National Science Foundation was
(continued...)

"analyzed under three alternatives, two action alternatives located within HO:  the Mees Alternative (the Preferred Alternative) and the Reber Circle Alternative, and a No-Action Alternative."

The FEIS analyzed the environmental impacts from the ATST in the following categories:  (1) land use and existing activities, (2) cultural, historic, and archeological resources, (3) biological resources, (4) topography, geology, and soils, (5) visual resources and view planes, (6) visitor use and experience, (7) water resources, (8) hazardous materials and solid waste, (9) infrastructure and utilities, (10) noise, (11) climatology and air quality, (12) socioeconomics and environmental justice, (13) public services and facilities, and (14) natural hazards.[7]

Most relevant to this appeal are the FEIS's conclusions about the impacts on cultural and visual resources from the construction and operation of the ATST.  Regarding the cultural resources category, the FEIS determined:

> Construction and operation of the proposed ATST
> Project at either the Preferred Mees or Reber Circle
> sites would result in major, adverse, short- and
> long-term, direct impacts on the traditional cultural

---

[6](...continued)
the lead agency responsible for completing the FEIS, and will be funding the construction of the ATST.

[7]     The FEIS reported the impacts in each category in several ways. The impacts were described as direct, indirect, or cumulative, and categorized as negligible, minor, moderate, or major.  The FEIS also determined whether the impacts were long-term or short-term in duration.  Lastly, the FEIS considered whether mitigation measures would reduce the duration, intensity, or scale of the impacts.

> resources within the ROI [Region of Influence[8]]. No indirect impacts are expected. Mitigation measures would be implemented; however, those measures would not reduce the impact intensity: impacts would remain major, adverse, long-term and direct.

In addition, the FEIS found that "under the No-Action Alternative, there would continue to be major, adverse, long-term, direct impacts to traditional cultural resources."

In the visual resources and view planes category, the FEIS analyzed the impacts from two general viewpoint areas: (1) land within Haleakalā National Park and (2) various areas on the island of Maui, where the current HO facilities are visible. The FEIS determined that from either the preferred Mees site or the Reber Circle site, the direct impact on visual resources within the Park would be moderate, adverse, and long-term:

> No mitigation would adequately reduce this impact. The new structure would be visible to the point of co-dominance with other nearby structures. It would intensify the already developed appearance in its immediate surroundings, and would also appear to increase slightly the amount of horizontal space occupied by structures in views from within the Park. The new structure would not substantially alter the existing visual character visible in any view.

Further, the FEIS concluded that from outside the Park, the impact of building the ATST at either the Mees site or the Reber Circle site "would result in minor, adverse and long-term impact to visual resources[,]" and therefore "[n]o mitigation would be necessary."

---

[8]    "Region of Influence" refers to the HO site and surrounding areas, including Haleakalā National Park.

The FEIS also analyzed each category for cumulative impacts, defined as "impacts from past, present, and reasonably foreseeable future actions within the ROI . . . . combined with the potential impacts from the proposed ATST Project." In the cultural resources category, the FEIS found that the cumulative impacts would be major, adverse, and long-term at either site and that implementation of mitigation measures would not reduce these impacts. In the visual resources category, the FEIS found that the cumulative impacts would be major, adverse, and long-term from areas within the Haleakalā National Park, and negligible, adverse, and long-term from other areas on Maui.

**2. Management plan**

UHIfA submitted a draft MP with its CDUA on March 1, 2010, and submitted the final MP to BLNR on June 8, 2010.[9] The MP "is the governing document used for existing and future development at HO." It "specifies the design and environmental criteria that would be followed when implementing development, and presents strategies for managing, monitoring, and protecting the various natural and cultural resources[.]"

The Executive Summary section of the MP summarized the strategies offered by UHIfA to protect cultural, historic, and

_____

[9] The MP was meant to supersede and replace the management planning policies and practices in UHIfA's Long Range Development Plan (LRDP) from January 2005. The LRDP described the general conditions at the HO site, the principles behind the current and future scientific projects that UH planned at the HO site, and the planning process to protect the Haleakalā summit.

archeological resources:

> Monitoring strategies are presented to ensure the
> protection of cultural, historic, and archeological
> resources through policies, practices, and procedures
> developed in consultation with Native Hawaiian
> practitioners, agencies, interested individuals, and
> the Maui community, to ensure that historic
> preservation concerns are met. Monitoring strategies
> are also presented to prevent introduction of alien
> invasive species (AIS), to protect endangered species,
> and to educate all workers and contractors as to the
> potential impacts of construction and operations on
> the cultural and biological resources. Monitoring for
> construction practices to protect all resources at the
> site is described. Finally, the MP imposes certain
> design criteria on new facilities to minimize
> inappropriate design elements within the natural
> environment at the summit.

A final environmental assessment (FEA) was completed on October 25, 2010. The FEA examined the anticipated impacts from the MP's implementation. The purpose of the FEA was to "inform the relevant state agencies and the public of the likely environmental consequences of the MP on ongoing and future actions at HO in support of astronomical research." The FEA concluded that the MP would "either have beneficial, less than significant, or no impacts on the environment."[10]

C. BLNR Administrative Proceedings

BLNR's review and ultimate approval of UHIfA's application involved a series of events which are relevant to this appeal. As set forth below, these included BLNR's grant of a permit, Kilakila's appeal of that permit, a contested case

---

[10] The sufficiency of the FEA was challenged on appeal to this court in Kilakila ʻO Haleakalā v. Univ. of Hawaiʻi, 134 Hawaiʻi 86, 332 P.3d 688 (App. 2014), cert. granted, SCWC-13-0000182 (Sept. 12, 2014).

hearing, ex parte communications involving the hearing officer, BLNR's dismissal of that hearing officer and appointment of a new hearing officer, Kilakila's motions for disclosure of any additional ex parte communications, the new hearing officer's recommendation to BLNR, and BLNR's grant of a second permit.

### 1.    BLNR approval of the first ATST permit:  CDUP MA-3542

On November 22, 2010, BLNR held its first public hearing on the ATST's MP and CDUA.  On December 1, 2010, BLNR approved the MP and granted CDUP MA-3542 during its regular board meeting.  CDUP MA-3542 permitted the construction of the ATST, subject to several conditions.  Kilakila made three requests for a contested case hearing[11] prior to and immediately after BLNR's approval, and BLNR took no action on the requests.  Kilakila subsequently appealed to the circuit court, arguing that BLNR erred in denying Kilakila's request for a contested case hearing

---

[11]    A contested case hearing is a quasi-judicial administrative hearing conducted pursuant to HAR § 13-1-28 (2009), which states:

> (a) When required by law, the board shall hold a contested case hearing upon its own motion or on a written petition of any government agency or any interested person.
>
> (b) The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter.
>
> (c) Any procedure in a contested case may be modified or waived by stipulations of the parties.

11

and in granting CDUP MA-3542.[12]  See Kilakila I, 131 Hawai'i at 207, 317 P.3d at 41.

### 2.  Contested case hearing

While the appeal of CDUP MA-3542 was pending, BLNR granted Kilakila's request for a contested case hearing, and on February 11, 2011, Steven Jacobson was appointed as the hearing officer.

On June 2, 2011, Kilakila filed a motion to disqualify deputy attorneys general Linda Chow and Julie China from advising Jacobson or BLNR at the contested case hearing.  Kilakila asserted that Chow and China could not serve as counsel for BLNR because "[t]hey have filed documents in circuit court arguing that the BLNR could legally grant a conservation district use permit for the [ATST]."  On June 28, 2011, Jacobson denied Kilakila's motion because he would not be relying on advice from Chow or China in making his recommendation to BLNR.  Jacobson dismissed the motion without prejudice so that Kilakila could renew its motion after Jacobson issued his recommendation to BLNR.

The contested case hearing was held over four days,

---

[12]    That appeal ultimately resulted in this court's decision in Kilakila I, in which we held that the circuit court had jurisdiction over the appeal pursuant to HRS § 91-14 and that Kilakila's request for a contested case hearing should have been granted prior to BLNR's approval of the permit. 131 Hawai'i at 205-06, 317 P.3d at 39-40.  We remanded to the circuit court regarding Kilakila's request for stay or reversal of CDUP MA-3542.  Id. at 206, 317 P.3d at 40.  The parties then stipulated to void CDUP MA-3542, which ended the appeal.

from July 18-20 and on August 26, 2011.  On February 23, 2012, Jacobson issued his proposed findings of fact, conclusions of law, and decision and order, recommending approval of the permit.

On March 2, 2012, Kilakila renewed its motion, this time to BLNR, to disqualify Chow and China.  Kilakila argued that Chow and China have "appeared as adversaries to [Kilakila] at hearings regarding the conservation district use application."  On March 12, 2012, Jacobson issued his final findings of fact, conclusions of law, and decision and order, which recommended that BLNR approve the permit to construct the ATST.  On March 16, 2012, BLNR denied Kilakila's March 2, 2012 motion, noting that while Chow and China appeared as counsel for BLNR in a prior circuit court proceeding, "the appearance by the deputy attorneys general as counsel for the Board in that circuit court proceeding does not disqualify the deputy attorneys general from advising the Board in this administrative proceeding."

### 3.  Minute Order No. 14 regarding ex parte communication

On March 19, 2012, BLNR filed Minute Order No. 14 "RE: EX PARTE COMMUNICATION[.]"  The order explained to the parties that BLNR had been notified that Jacobson sent an email to UHIfA's counsel on March 15, 2012.  In the email, which was attached to the order, Jacobson stated that he had received "inappropriate ex parte pressure and activity by US Senator [Daniel] Inouye's and the Governor's offices" which "essentially

13

required" him to submit an incomplete report and recommendation to BLNR.  Jacobson had contacted "appropriate ethical offices" and was informed that disclosures were not required where:

> (1) neither UHIfA nor its counsel had anything to do with what the Senator's and Governor's offices were doing, (2) the Board and courts disregard the interim [proposed] report and recommendations and consider only the final report and recommendations (to the extent they consider them at all), and (3) Kilakila is not prejudiced by being shortchanged in time to respond to the final report and recommendations.

The email from Jacobson concluded with a question to UHIfA's counsel as to "whether any of you had anything to do with what the Senator's and Governor's offices were doing."

BLNR's order noted that the email between Jacobson and UHIfA's counsel "was an unpermitted ex parte communication[,]" which "call[ed] into question the Hearing Officer's impartiality" in relation to his report and recommendation to BLNR.  BLNR stated that it was considering the following actions in response to the ex parte communication:

> 1.  Striking the Report and Final and Amended Report from the record;
>
> 2.  Discharging the Hearing Officer, Steven Jacobson, as the hearing officer in this case; and
>
> 3.  Retaining a new hearing officer to review the record of the proceedings in this case and to issue a new hearing officer's report and proposed findings of fact, conclusions of law, and decision and order.  The new hearing officer would be authorized to conduct additional fact finding as necessary.

BLNR scheduled a hearing and invited the parties to file comments or objections to the proposed actions.

On March 20, 2012, Jacobson filed a response to BLNR's

14

order, describing what he characterized as the pressure placed on

him by the Governor's office to release his recommendation and to

consult deputy attorney general Chow:

> In this file, while preparing my report and recommended decision, considerable ex parte pressure was placed upon me to simply spit out a recommended decision quickly, so that the Board would have something before it, to approve. That pressure included requiring me to make daily reports to both the Health Department and the Board's Chair as to how soon I contemplated finishing, what else I thought I needed to do, why I thought I had to do it, etc.

> The pressure included a "suggestion" that Deputy General Chow be given a role in completing the decision.

> I was advised that the pressure was generated by a staffer in US Senator Inouye's office, and applied through the Governor's office. I was not asked to recommend a particular result, although the result Senator Inouye's office wanted from the Board was clear. I did not see any evidence that anyone else (i.e., anyone in State Government), wanted any particular result, and the Board's Chair, in particular, made clear that all he wanted to know was when this matter could be put on the Board's calendar.

> My initial [proposed] report and recommended decision herein were filed as a result of "or else" pressure. The only way the pressure affected my initial [proposed] report and recommended decision was that they were incomplete. I made no substantive changes in light of comments by Ms. Chow.

> I then completed my final report and recommendations. In completing them, the only effect of the previous pressure upon me (which had been withdrawn) was that I very carefully went through everything UHIfA submitted, again, to be sure that I hadn't missed something that those favoring the ATST Project might be hoping that I would miss.

> Again, nothing substantive was changed due to anything said by Ms. Chow. The final report and recommendations are entirely mine.

UH responded to Minute Order No. 14 by "urg[ing]" BLNR

to review the record and issue a decision without appointing a

new hearing officer. In the alternative, UH requested that:

15

"(1) the additional fact finding should be limited to a site visit; and (2) the new Hearing Officer should be required to respond to the Board within a reasonable time frame."  Kilakila also responded, requesting the appointment of a new hearing officer as well as disclosures of "any communications tending to show that external pressure was applied to affect the outcome of [the] proceeding."

### 4.   Minute Order No. 15 discharging hearing officer Jacobson

On March 29, 2012, following a hearing on the issue of the ex parte communications, BLNR filed Minute Order No. 15, which discharged Jacobson and authorized the appointment of a new hearing officer "to avoid even the appearance of impropriety." BLNR concluded that the email from Jacobson to UHIfA's counsel was "an unpermitted ex parte communication in violation of Hawai'i Administrative Rules (HAR) § 13-1-37."[13]  BLNR also struck

_____

[13]     HAR § 13-1-37 (2009) provides:

> (a) No party or person petitioning to be a party in a contested case, nor the party's or such person's to a proceeding before the board nor their employees, representatives or agents shall make an unauthorized ex parte communication either oral or written concerning the contested case to the presiding officer or any member of the board who will be a participant in the decision-making process.
>
> (b) The following classes of ex parte communications are permitted:
>
>      (1) Those which relate solely to matters which a board member is authorized by the board to dispose of on ex parte basis.

(continued...)

16

Jacobson's recommendation from the record and authorized the new hearing officer to make a ruling regarding Kilakila's standing, issue a new recommendation within sixty days of appointment, schedule a site visit with the parties, hold additional evidentiary hearings as necessary, and consider a supplemental environmental assessment dated February 10, 2012.

### 5.    Kilakila's motion for disclosure

On March 30, 2012, Kilakila filed a motion for disclosure of BLNR's communications regarding the ATST. Kilakila's motion sought:

> [T]o have each member of the BLNR disclose any and all communication (written, electronic and oral) that mentioned or related to the University's proposed Advanced Technology Solar Telescope except for (a) communications between board members; (b) communications between any board member and the Board's counsel; (c) any board meeting when the ATST was a subject matter of the agenda.

The request included "any and all communication with Senator Inouye or his staff, the Governor or his staff, politicians, union leaders and members and construction industry representatives that mentioned or related to the [ATST]."

In support of the motion, Kilakila cited hearing officer Jacobson's statements regarding the ex parte

---

[13](...continued)
    (2) Requests for information with respect to the procedural status of a proceeding.

    (3) Those which all parties to the proceeding agree or which the board has formally ruled may be made on an ex parte basis.

17

communications, as well as testimony from a former superintendent
of Haleakalā National Park who also noted pressures from Senator
Inouye's office regarding the ATST:

> While serving as superintendent, I was well
> aware of Senator Inouye's displeasure with my
> statements/comments against the construction of the
> ATST.  His staff assistant, James Chang placed heavy
> pressure on me to mute objections that the National
> Park Service had regarding the impacts of the ATST.
> For example, in a meeting with Mr. Chang, he strongly
> encouraged me to go along with the construction of the
> ATST project.  When I stated it was my job to guard
> against such extreme impacts to this majestic national
> park, he indicated that he would go to the Secretary
> of the Interior to override my objections.

UH opposed Kilakila's motion, arguing that the request
was a "fishing expedition" with no factual or legal basis.  In
reply, Kilakila asserted that it was aware of at least one ex
parte communication between a member of BLNR and the Governor's
office.  Kilakila attached emails obtained pursuant to a records
request from the Governor's office, which provided evidence of a
meeting on March 21, 2012 between the Governor's office, the
Attorney General's office, Senator Inouye's office, and BLNR
Chairperson William Aila to discuss the ATST.  These include a
March 21, 2012 email between Bruce Coppa, the Governor's chief of
staff, and another staff member.  The staff member informs Coppa,
"Jennifer [Sabas, Senator Inouye's chief of staff,] requested a
meeting today at 3 p.m. to discuss the telescope, hearings
officer and funding issue.  AG will be coming in and Chair Aila
is pending."

### 6.  Minute Order No. 23 partially granting Kilakila's motion for disclosure

On June 24, 2012, BLNR issued Minute Order No. 23 granting Kilakila's motion only "with regard to the meeting held on March 21, 2012[.]"  BLNR informed Kilakila and UHIfA that a meeting occurred on March 21, 2012, in which Aila participated. BLNR noted that "[d]uring the meeting the sole topic of discussion was when the recommended decision in this contested case would be issued by the hearing officer, Steven Jacobson."  BLNR concluded that no further action was warranted:

> Inasmuch as no party was present during the meeting, there was no ex parte communication with the hearing officer or any member of the Board.  Even if a party were present, the discussion . . . comes within the purview of Hawaiʻi Administrative Rule (HAR) § 13-1-37 as a permitted communication related to requests for information with respect to the procedural status of a proceeding.  No further action is required regarding this communication.

BLNR noted that Kilakila failed to "provide a time frame or context for the requested disclosures" and thus its "motion may encompass communications that occurred long before this matter was the subject of a contested case."  BLNR further noted that Kilakila failed to show any communications beyond what was allowed under HAR § 13-1-37 and that its motion was "based, at most, upon mere speculation."  Finally, BLNR concluded that it had not "acted in any manner other than as an impartial adjudicator" and that any prejudice to Kilakila had been rectified by the discharge and replacement of hearing officer

Jacobson.

### 7. Kilakila's motion to reconsider Minute Order No. 23

On June 8, 2012, Kilakila filed a motion to reconsider Minute Order No. 23. Kilakila alleged that the "sole topic" of the March 21, 2012 meeting could not have been the timing of the release of Jacobson's recommendation because Jacobson had already issued his initial and final decisions at this point. Kilakila also requested communications between any member of BLNR and "anyone else" that related to the ATST:

> [F]or the sake of appellate court review, this Board should respond definitively as to whether or not there were any communications (oral, written or electronic) between any member of the Board and anyone else that mentioned or related to the University's proposed Advanced Technology Solar Telescope with anyone (except for (a) communications between board members; (b) communications between any board member and the Board's counsel; (c) any board member when the ATST was a subject matter on the agenda) from the time that Kilakila ʻO Haleakalā requested a contested case hearing.

On July 13, 2012, BLNR granted Kilakila's motion in part, amending Minute Order No. 23: "During the meeting, the sole topic of discussion was when the final decision in the contested case would be issued, in light of Minute Order No. 14 [regarding Jacobson's ex parte communication], filed on March 19, 2012."

### 8. Hearing officer Ishida's recommendation

On July 16, 2012, the new hearing officer, Lane Ishida, filed a report, proposed findings of fact and conclusions of law,

20

decision, and order, which recommended that BLNR grant the CDUP, subject to several conditions. To support her recommendation, Ishida made several findings, including that the ATST was consistent with the purposes of the conservation district and general subzone, would not cause substantial adverse impact to existing natural resources, and would not be materially detrimental to public health, safety, and welfare.

### 9. Kilakila's second motion to reconsider Minute Order No. 23

On September 27, 2012, Kilakila filed a second motion to reconsider Minute Order No. 23. Kilakila attached additional documents obtained from UH pursuant to a records request. Most relevant to this appeal are six email communications, which are summarized as follows:

- January 30, 2012: Mike Maberry (UHIfA), emailed Jennifer Sabas, Senator Inouye's chief of staff, regarding the ATST. Maberry stated that he knew that Sabas had already spoken with Aila, "but as previously mentioned, Steve Jacobsen [sic] doesn't work for Aila he works for Fuddy. Would it be possible for you or someone to talk with Fuddy to see if it could be clarified that Steve's work priority is to complete the Finding of Facts, Conclusions of Law and Recommendation in the ATST Contested Case?"

- January 30, 2012: In response to Maberry's email, Sabas emailed Bruce Coppa, the Governor's chief of staff, stating: "can you reach out to loretta fuddy who apparently the hearing officer is on contract with rather than dlnr--uh and my feds are getting really really nervous about losing the money for the atst."

21

- January 30, 2012:  Coppa responded to Sabas, stating: "I will speak with Loretta.  I also spoke with Bill and asked to please help[.]"

- January 31, 2012:  Sabas responded to Coppa noting, "Thanks.  This will be bad if we lose it."

- January 31, 2012:  Maberry emailed Sabas regarding a potential meeting between the Governor's office, Senator Inouye's office, and BLNR regarding the ATST.  Maberry noted that UH could not meet with BLNR until after BLNR acted on the hearing officer's recommendation "or it could jeopardize the Contested Case."

- January 31, 2012:  Sabas responded to Maberry regarding his inability to attend the proposed ATST meeting and noted that she could "carry the message and [could] also carry the uh message."

Kilakila contended that these documents demonstrated that "the applicant has acted in bad faith; immense political pressure has been applied in this case that is even greater than prior documents had revealed; and Williams Aila Jr. has received more ex parte communication than has been previously revealed." Kilakila then sought the following disclosure:

> At a minimum, the BLNR must disclose information about Bruce Coppa's ex parte communication with William Aila, Jr. and Jennifer Sabas' ex parte communication with William Aila, Jr. . . .  If, in any of the ex parte communications, anyone communicated to any member of the Board the reasons that a decision needed to be expedited, this should be disclosed to Kilakila ʻO Haleakalā.

On November 9, 2012, BLNR issued an order denying Kilakila's second motion to reconsider Minute Order No. 23.  BLNR noted that Kilakila "fails to show that any unpermitted ex parte communications occurred between the former hearing officer or any

22

Board members and one of the parties in this case that would be a basis to reconsider this Board's prior Order No. 23."

10. **BLNR's approval of the second ATST permit: CDUP MA-11-04**

On November 9, 2012, BLNR issued its findings of fact, conclusions of law, decision and order approving a second permit for the ATST, CDUP MA-11-04. BLNR made findings of facts concerning the parties to the contested case hearing, the procedural background of the permit application, the ATST project description, the Section 106 consultation[14], the FEIS, and the anticipated benefits of the ATST. BLNR then made conclusions of law under HAR § 13-5-30(c)(1)-(8) (1994), which provides the criteria for "evaluating the merits of a proposed land use" and granting a CDUP:

> (c) In evaluating the merits of a proposed land use, the department or board shall apply the following criteria:
>
>   (1) The proposed land use is consistent with the purpose of the conservation district;
>
>   (2) The proposed land use is consistent with the objectives of the subzone of the land on which the use will occur;
>
>   (3) The proposed land use complies with provisions and guidelines contained in chapter 205A, HRS, entitled "Coastal Zone Management", where applicable;
>
>   (4) The proposed land use will not cause

---

[14] In its order, BLNR explains, "Section 106 of the [National Historical Preservation Act] requires federal agencies to take into account the impacts of the agencies' undertakings on historic properties and to afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment on such undertakings."

23

substantial adverse impact to existing natural resources within the surrounding area, community, or region;

(5) The proposed land use, including buildings, structures, and facilities, shall be compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel or parcels;

(6) The existing physical and environmental aspects of the land, such as natural beauty and open space characteristics, will be preserved or improved upon, whichever is applicable;

(7) Subdivision of land will not be utilized to increase the intensity of land uses in the conservation district; and

(8) The proposed land use will not be materially detrimental to the public health, safety, and welfare.

The applicant shall have the burden of demonstrating that a proposed land use is consistent with the above criteria.

"Based upon the evidence and testimony presented in this case," BLNR concluded that the ATST satisfied each of the eight criteria, UH "met its overall burden of proof[,]" and a CDUP for ATST was approved, subject to twenty conditions.

## D.   Circuit Court Proceedings

Kilakila appealed BLNR's decision to the Circuit Court of the First Circuit.[15]  On July 11, 2013, after holding oral argument and reviewing the parties' briefings, the circuit court issued its Order affirming BLNR's decision to grant CDUP MA-11-04.  The circuit court filed its Final Judgment on August 20, 2013.

---

[15]     The Honorable Rhonda A. Nishimura presided.

24

## E.   ICA Proceedings

Kilakila appealed to the Intermediate Court of Appeals.[16]  The ICA rejected each of Kilakila's points of error in its October 17, 2014 Memorandum Opinion, which affirmed the circuit court's judgment and BLNR's decision.  The ICA's Judgment on Appeal was filed on November 13, 2014.  Kilakila timely applied for writ of certiorari on December 1, 2014.

## II.   Standards of Review

Appellate court review of a circuit court's review of an administrative decision is a secondary appeal.  "The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) (1993) to the agency's

---

[16]    Kilakila contended that the circuit court erred because:

(1) the Board's approval did not comply with Hawaiʻi Administrative Rules (HAR) § 13-5-3(c) (1994);

(2) the Board erred by considering economic factors;

(3) the Board erred by weighing the lack of alternatives against the Solar Telescope's adverse impacts,

(4) the correct entity did not apply for the conservation district use permit (CDUP),

(5) the Solar Telescope is inconsistent with the June 8, 2010 Management Plan (Management Plan) prepared by the University of Hawaiʻi Institute for Astronomy (UIA),

(7)[sic] the Board violated Kilakila's procedural due process rights; and

(8)[sic] the Board acted pursuant to unauthorized procedure.

25

decision." Save Diamond Head Waters LLC. v. Hans Hedemann Surf, Inc., 121 Hawaiʻi 16, 24, 211 P.3d 74, 82 (2009) (citing Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawaiʻi 184, 193, 159 P.3d 143, 153 (2007); Korean Buddhist Dae Won Sa Temple of Hawaiʻi v. Sullivan, 87 Hawaiʻi 217, 229, 953 P.2d 1315, 1327 (1998)).

HRS § 91-14(g), "Judicial review of contested cases," provides as follows:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection

26

(6)." Save Diamond Head Waters, 121 Hawaiʻi at 24-25, 211 P.3d at 82-83 (quoting Paul v. Dep't of Transp., 115 Hawaiʻi 416, 426, 168 P.3d 546, 556 (2007)) (internal brackets omitted).

"Pursuant to HRS § 91-14(g), an agency's conclusions of law are reviewed de novo." United Pub. Workers, AFSCME, Local 646, AFL-CIO v. Hanneman, 106 Hawaiʻi 359, 363, 105 P.3d 236, 240 (2005) (internal quotation marks and citation omitted). "A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." Save Diamond Head Waters, 121 Hawaiʻi at 25, 211 P.3d at 83 (quoting Del Monte Fresh Produce (Hawaiʻi), Inc. v. Int'l Longshore and Warehouse Union, Local 142, AFL-CIO, 112 Hawaiʻi 489, 499, 146 P.3d 1066, 1076 (2006)).

An agency's interpretation of its own rules is generally entitled to deference unless "plainly erroneous or inconsistent with the underlying legislative purpose." Panado v. Bd. of Trs., Emps.' Ret. Sys., 134 Hawaiʻi 1, 11, 332 P.3d 144, 154 (2014). An agency's exercise of discretion "will not be overturned unless 'arbitrary, or capricious, or characterized by . . . [a] clearly unwarranted exercise of discretion.'" Paul's Elec. Serv. Inc. v. Befitel, 104 Hawaiʻi 412, 498-99, 91 P.3d 494, 416-17 (2004) (citing HRS § 91-14(g)(6)).

## III. Discussion

Kilakila's application for writ of certiorari raises several issues,[17] many of which overlap or were raised without

---

[17]     Kilakila's application raised the following thirteen points of error:

1.  Did the ICA err in affirming the Circuit Court's affirmation of the BLNR's decision?  More specifically, the questions presented include:

2.  Did the ICA err when it held that an agency can use decisionmaking criteria that are not identified in its own rules--despite this Court's rulings in Aluli v. Lewin, 73 Haw. 56, 61, 828 P.2d 802, 805 (1992), Mahuiki v. Planning Comm'n, 65 Haw. 506, 519-20, 654 P.2d 874, 882-83 (1982), Ainoa v. Unemployment Compensation Appeals Div., 62 Haw. 286, 614 P.2d 380 (1980), and Aguiar v. Hawaiʻi Hous. Auth., 55 Haw. 478, 522 P.2d 1255 (1974)?

3.  In determining whether the ATST project is consistent with the purposes of the land use law and the conservation district, did the ICA err by (a) confusing an "as applied" challenge with a "facial" challenge; (b) failing to employ this Court's analysis in Neighborhood Bd. No. 24 (Waianae Coast) v. State Land Use Comm'n, 64 Haw. 265, 639 P.2d 1097 (1982); and (c) refusing to consider whether the proposed ATST project itself "frustrates the state land use law's basic objectives," Curtis v. Board of Appeals, 90 Hawaiʻi 384, 396, 978 P.2d 822, 834 (1999)?

4.  Should the courts take a close look at the record in cases affecting the environment?

5.  Did the ICA err in concluding that the ATST project would not have substantial impacts when (a) the applicant repeatedly admitted that the impacts would be substantial; (b) the BLNR and the ICA failed to point to any evidence that the impacts to cultural resources would not be substantial, as required by In re Kauai Elec. Div., 60 Haw. 166, 184, 590 P.2d 524, 537 (1978); (c) there was no evidence that the mitigation measures would reduce the intensity of the impacts to less than substantial; and (d) the BLNR relied on the final environmental impact statement (FEIS) to reach certain conclusions, but without any explanation ignored other portions of the FEIS?

6.  Did the ICA err by relying on grounds not "invoked by the agency," In re Water Use Permit Applications,

(continued...)

28

any supporting argument.  See HRAP 40.1(d) (applications for writ of certiorari shall contain a "short and concise statement of the questions presented" and a "brief argument with supporting authorities").  Therefore, we address the following questions, which we consider controlling and dispositive:

> (1) Did the ICA err in concluding that the permit approval process was not procedurally flawed, specifically that BLNR did not prejudge CDUP MA-11-04 and was not improperly influenced by ex parte communications?
>
> (2) Did the ICA err in concluding that BLNR's findings

_____

(...continued)

> 94 Hawai'i 97, 163, 9 P.3d 409, 475 (2000)?
>
> 7.  Did the ICA err in interpreting HAR § 13-5-30(c)(6) in a manner that excludes consideration of natural beauty and open space characteristics?
>
> 8.  Did the ICA err in assuming that the lease of a portion of land does not subdivide it despite the plethora of law to the contrary?
>
> 9.  Did the ICA err in holding that the ATST project is consistent with a valid management plan?
>
> 10.  Did the BLNR prejudge the issue by granting the CDUP before the contested case was held and then authorizing some construction activities to proceed pursuant to that permit prior to completion of the post hoc contested case hearing?
>
> 11.  Did the ICA err in relying on HRS § 171-6(20) to justify the BLNR's conduct pursuant to HRS chapter 183C when chapter 183C is not part of HRS chapter 171?
>
> 12.  Was the BLNR's post hoc contested case hearing tainted by political pressure, ex parte communication, the refusal to fully and timely disclose the extent of ex parte communication, the dual role of the deputy attorney general as adversary and advisor to the tribunal, and the arbitrary deletion of key findings by the hearing officer?
>
> 13.  Did the ICA err in holding that the applicant was authorized to apply for the permit?

29

under HAR § 13-5-30(c)(4),(5), and (6) were valid?

(3) Did the ICA err in concluding that the ATST was not inconsistent with the purposes of conservation districts and general subzones?

## A. The permit approval process did not suffer from procedural infirmities

Kilakila alleges that the approval process for CDUP MA-11-04 suffered from two procedural defects:  (1) BLNR prejudged the permit approval and (2) BLNR engaged in impermissible ex parte communications and failed to disclose them.  We address each of these issues below.

### 1. BLNR did not prejudge the permit prior to the contested case hearing

Before addressing the issue of prejudgment, it is necessary to review the underlying sequence of events.  At the first public hearing regarding the ATST's CDUA, Kilakila requested that BLNR conduct a contested case hearing.  Without granting Kilakila's request, BLNR approved the first permit for the construction of the ATST, CDUP MA-3542.  Kilakila then appealed BLNR's decision to grant the permit prior to holding a contested case hearing.

That appeal resulted in this court's decision in Kilakila I, in which we held that the circuit court had jurisdiction over the appeal pursuant to HRS § 91-14 and that Kilakila's request for a contested case hearing should have been granted prior to BLNR's approval of the permit.  131 Hawaiʻi at

205-06, 317 P.3d at 39-40.  We remanded to the circuit court regarding Kilakila's request for stay or reversal of CDUP MA-3542.  Id. at 206, 317 P.3d at 40.  On remand, the parties entered into a stipulation, titled "Stipulation That the Conservation District Use Permit (CDUA MA-3542) Is Void":[18]

> IT IS HEREBY STIPULATED by and amongst the parties described below, through their respective undersigned counsel that the conservation district use permit (CDUA MA-3542) granted by the Board of Land and Natural Resources and the Department of Land and Natural Resources in December 2010 is void.

This stipulation ended the appeal.

While the appeal regarding CDUP MA-3542 was pending, BLNR granted Kilakila's request for a contested case hearing. After the contested case hearing, on November 9, 2012, BLNR issued an order approving a second permit for the construction of the ATST, CDUP MA-11-04.  It is that permit that is the subject of the instant appeal.

Kilakila now asserts that BLNR prejudged the permit at issue in this case, CDUP MA-11-04, because it approved construction prior to the completion of the contested case

---

[18]    The stipulation was not included in the record for this case, but in the record of the pending case Kilakila ʻO Haleakalā v. Univ. of Hawaiʻi, 134 Hawaiʻi 86, 332 P.3d 688 (App. 2014), cert. granted, SCWC-13-0000182 (Sept. 12, 2014).  We may therefore take judicial notice of the stipulation. See Hawaiʻi Rules of Evidence 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute that is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably be questioned."); see also State v. Puaoi, 78 Hawaiʻi 185, 190, 891 P.2d 272, 277 (1995) ("[A]n appellate court may take judicial notice of facts despite the failure of the trial court to do so, provided that the facts are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy.") (internal quotation marks and citation omitted).

hearing.  However, this construction was for the removal of an unused foundation at the Reber Circle site.  BLNR did not approve any construction of the ATST itself.  The removal of the unused foundation was previously supported by Kilakila and was required by other agreements, such as the Archaeological Recovery Plan that BLNR approved in 2006.  Furthermore, no construction ultimately occurred prior to the completion of the contested case hearing.

Kilakila also argues that BLNR prejudged the second permit, CDUP MA-11-04, by voting on the first permit, CDUP MA-3542, prior to a contested case hearing.  The issue of prejudgment was recently addressed by this court in Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 363 P.3d 224 (2015), in which we held that BLNR's decision to approve a permit prior to a contested case hearing violated appellants' due process rights.  Id. at 391; 363 P.3d at 239.  This case is dissimilar to Mauna Kea, insofar as here Kilakila entered into a stipulation with BLNR and UH to void the first permit.  Since BLNR's initial approval of CDUP MA-3542 was voided, appellants' due process rights were adequately protected by the contested case hearing and subsequent vote by BLNR.  See Hawai'i Elec. Light Co. v. Dep't of Land & Nat. Res., 102 Hawai'i 257, 266, 74 P.3d 160, 169 (2003) (holding that, when BLNR's initial vote on a permit was later invalidated, "the constitutional right of due

32

process was adequately protected through the contested case hearing process and the subsequent votes by the Board").

Indeed, the stipulation rendered the first permit "of no validity or effect." Black's Law Dictionary 1805 (10th ed. 2014) (defining "void" as "[t]o render of no validity or effect; to annul"). Because the first permit was deemed invalid by the stipulation, Kilakila received the relief sought in its previous appeal. Kilakila cannot now seek to vacate the second permit based on the first permit, which Kilakila voluntarily stipulated to void.

In sum, the permit approval process for CDUP MA-11-04 met procedural due process requirements. BLNR did not approve any construction of the ATST itself prior to the completion of the contested case hearing. Since BLNR's initial approval was voided, appellants' due process rights were protected by the contested case hearing and subsequent vote by BLNR.

## 2. **Ex parte communications with BLNR were not improper**

Kilakila argues that the ICA erred in concluding that BLNR's permit approval process was not subject to impermissible ex parte political pressure. Kilakila alleges that the Governor and Senator Inouye's offices exerted pressure on BLNR Chairperson Aila in order to attain approval of the telescope, and that BLNR failed to disclose these ex parte communications.

The ICA rejected Kilakila's argument on the basis that

33

BLNR promptly removed Jacobson as the hearing officer and disregarded his recommendation, curing any allegation of partiality involving Jacobson.  The ICA also noted that Kilakila did not contend that hearing officer Ishida, who ultimately made the recommendation to BLNR, was subject to any ex parte communication or political pressure.

We agree with the ICA that any concern of impropriety was cured when BLNR replaced Jacobson with Ishida.  Indeed, this is precisely the relief that Kilakila requested.

However, the ICA did not consider whether any ex parte communications involving Aila tainted the permit approval process or whether BLNR improperly denied Kilakila's discovery requests for additional communications involving the ATST.  Though we note that Kilakila never moved to disqualify Aila as it did with Jacobson, we address these questions now.

The communications at issue here are:  (1) the March 21, 2012 meeting between Aila, the Governor's office, the Attorney General's office, and Senator Inouye's office, (2) the January 30-31, 2012 emails between Jennifer Sabas of Senator Inouye's office and Mike Maberry of UHIfA, and (3) the January 30-31, 2012 emails between Sabas and Bruce Coppa of the Governor's office.

We first determine whether the communications violated the relevant administrative rule, HAR § 13-1-37.  HAR § 13-1-37

34

governs ex parte communication in contested case proceedings and

provides:

> (a)  No party or person petitioning to be a party in a contested case, nor the party's or such person's to a proceeding before the board nor their employees, representatives or agents shall make an unauthorized ex parte communication either oral or written concerning the contested case to the presiding officer or any member of the board who will be a participant in the decision-making process.
>
> (b)  The following classes of ex parte communications are permitted:
>
> (1)  Those which related solely to the matters which a board member is authorized by the board to dispose of on ex parte basis.
>
> (2)  Requests for information with respect to the procedural status of a proceeding.
>
> (3)  Those which all parties to the proceeding agree or which the board has formally ruled may be made on an ex parte basis.

HAR § 13-1-37 does not apply to the January 30-31, 2012

communications because they were not sent to "any member of the

board who will be a participant in the decision-making process."

HAR § 13-1-37(a).  Nor would it apply to the March 21, 2012

meeting between Aila, the Governor's office, the Attorney

General's office, and Senator Inouye's office.  Although Aila was

a "member of the board" as BLNR Chairperson, the other meeting

participants were not "part[ies] . . . to a proceeding" or a

party's "employees, representatives or agents."  HAR § 13-1-37(a)

(emphasis added).  There is no evidence that UH or Kilakila

attended the meeting.

Even if the Governor's office and Senator Inouye's

office were considered "representatives or agents" of UH, the meeting would not violate HAR § 13-1-37 because the "sole topic" of the discussion during the meeting was the timing of BLNR's final decision following the contested case hearing. The timing of BLNR's decision falls under the category of permitted ex parte communications, as "[r]equests for information with respect to the procedural status of a proceeding." HAR § 13-1-37(b)(2).

Though the communications were not impermissible ex parte communications in violation of HAR § 13-1-37, they may nevertheless demonstrate that improper outside influences tainted BLNR's permit approval. In In re Water Use Permit Applications (Waiāhole), this court determined whether external political pressure on an agency violated due process and invalidated the agency's decision. 94 Hawai'i 97, 123, 9 P.3d 409, 435 (2000). We noted:

> External political inference in the administrative process is of heightened concern in a quasi-judicial proceeding, which is guided by two principles. First, the appearance of bias or pressure may be no less objectionable than the reality. Second, judicial evaluation of the pressure must focus on the nexus between the pressure and the actual decision maker. As we have previously observed, the proper focus is not on the content of communication in the abstract, but rather upon the relation between the communications and the adjudicator's decisionmaking process.

Id. (internal quotation marks, brackets, and citations omitted; emphases in original).

This court then evaluated an allegation of improper

36

political pressure based on these principles. The petitioner in Waiāhole alleged that the Governor exerted improper influence on the Commission on Water Resource Management by publicly criticizing the Commission's proposed decision. Id. Consistent with the focus on "the relation between the communications and the adjudicator's decisionmaking process," this court noted that other instances of improper political influence involved "at minimum, some sort of direct contact with the decisionmaker regarding the merits of the dispute." Id. (emphases added).

The Governor's comments in Waiāhole did not meet this minimum standard. Although the Governor had made several statements that "related directly to the dispute before the Commission," there was not sufficient evidence of "direct and focused interference" in the Commission's decision-making. Id. at 124, 9 P.3d at 436. Thus, there was not a nexus between the Governor's comments and the Commission that demonstrated improper pressure on the Commission's decision. Id. at 124-25, 9 P.3d at 436-37.

Similar to Waiāhole, the communications here do not show evidence of "direct contact" with BLNR over the "merits of the dispute." The January 30-31, 2012 emails do not discuss the merits of the contested case hearing. Rather, as the ICA described, the emails appear to indicate concerns over "the possibility of losing funding for the [ATST] if construction did

37

not begin by a certain date." The email communications are also unclear on whether there was any direct contact with Aila. Only one email mentions Aila and states that "[Coppa, the Governor's chief of staff] spoke with [Aila] and asked to please help." The Governor's office and Senator Inouye's office did have direct contact with Aila at the March 21, 2012 meeting, but there is no evidence that they discussed anything other than the timing of BLNR's final decision following the contested case hearing.[19]

Undoubtedly, the public criticisms in Waiāhole and the timing concerns voiced here both placed pressure on the respective agencies. However, the question is not whether there was any pressure placed on the agency, but whether the pressure was directed at the merits of the agency's decision. While the communications here concerned the permit approval process for the ATST and therefore "related directly to the dispute before" BLNR, we are not presented with evidence of communications relating to the merits that would constitute "direct and focused interference" in BLNR's decision-making. Id. at 124, 9 P.3d at 436. In sum, we do not find that the political pressure placed

---

[19]     The March 21, 2012 email from a member of the Governor's staff to Coppa stated that "[Sabas] requested a meeting today at 3 p.m. to discuss the telescope, hearings officer and funding issue." Similar to the January 30-31, 2012 emails, the email indicates an interest in knowing when the final BLNR decision will be made given funding deadlines. It was also sent prior to the March 21, 2012 meeting by someone who appears to have helped schedule the meeting, but did not actually attend it. Thus, the fact that this email mentions "funding" does demonstrate that Aila discussed the merits of the case at the March 21, 2012 meeting.

on BLNR rose to the level of impropriety.

We now turn to Kilakila's three requests for communications regarding the ATST.  In its March 30, 2012 motion for disclosure, its June 12, 2012 motion to reconsider Minute Order No. 23, and its September 27, 2012 second motion to reconsider Minute Order No. 23, Kilakila sought the release of oral, written, and electronic communications involving BLNR members.  Kilakila was specifically concerned with ex parte communications involving Aila, though it never moved to disqualify Aila or any other BLNR member.  BLNR provided information about the March 21, 2012 meeting in response to the first two requests, and dismissed the third request outright.

We have concerns about BLNR's handling of Kilakila's requests.  For example, in light of Kilakila's receipt of the January 30-31, 2012 emails, BLNR could have granted discovery limited to the parties involved in the emails, rather than dismissing the request outright.  In future contested case hearings, BLNR could certainly do more to remove doubts of impropriety and build confidence in its permit approval process.

Despite these concerns, we cannot say that BLNR abused its discretion when it denied Kilakila's requests.  "[A] determination made by an administrative agency acting within the boundaries of its delegated authority will not be overturned unless 'arbitrary, or capricious, or characterized by . . . [a]

39

clearly unwarranted exercise of discretion.'" Paul's Elec.
Serv., 104 Hawaiʻi at 419, 91 P.3d at 501 (citing HRS §
91-14(g)(6)); see also Save Diamond Head Waters, 121 Hawaiʻi at
24, 211 P.3d at 82 (stating that an agency's exercise of
discretion is reviewable under the arbitrary and capricious
standard).

BLNR had broad discretion over Kilakila's discovery
requests, and it did in fact provide additional information in
response to the requests. See Hawaiʻi Ventures, LLC v. Otaka,
Inc., 114 Hawaiʻi 438, 472, 164 P.3d 696, 730 (2007) (stating
that courts have "considerable latitude and discretion" over
discovery requests). In its Minute Order No. 23, BLNR disclosed
the participants and nature of the March 21, 2012 meeting.
Later, BLNR clarified that the meeting's topic of discussion
concerned the timing of BLNR's decision in light of the dismissal
of hearing officer Jacobson. Contrary to Kilakila's argument,
BLNR was not required to provide all of the disclosures sought in
the requests. See id. (determining that the circuit court did
not abuse its discretion when it "did not grant all of the
requests for discovery[,]" but did require an opposing party
provide a financial statement which addressed concerns of
improper payment underlying the discovery requests).

BLNR also provided its reasoning for not disclosing
more information. It concluded that Kilakila's first request was

too broad, noting that it did not provide a time frame for the request and encompassed communications beyond the subject of the contested case hearing.  BLNR also concluded that Kilakila failed to show any improper ex parte communications, and as discussed above, we agree that the communications did not constitute an impermissible ex parte communication in violation of HAR § 13-1-37 or an improper political influence under the reasoning in Waiāhole.[20]

This reasoning was not unreasonable or unlawful.  See Del Monte Fresh Produce, 112 Hawaiʻi at 509, 146 P.3d at 1086 (Hawaiʻi Labor Relations Board did not abuse its discretion when its disputed action was not "unreasonable or in disregard of principles of law"); see also Hac v. Univ. of Hawaiʻi, 102 Hawaiʻi 92, 100, 73 P.3d 46, 54 (2003) ("[T]he extent to which discovery is permitted . . . is subject to considerable latitude and the discretion of the trial court.") (quoting Wakabayashi v. Hertz Corp., 66 Haw. 265, 275, 660 P.2d 1309, 1315 (1983)) (internal

---

[20]    In circumstances such as these, we have never held that procedural communications with agency officials raise due process concerns.  Thus, we need not employ any constitutional analysis, but instead must refer to the applicable statute and administrative rule, neither of which preclude procedural communications.  See HRS § 91-13 ("No official of an agency who renders a decision in a contested case shall consult any person on any issue of fact except upon notice and opportunity for all parties to participate, save to the extent required for the disposition of ex parte matters authorized by law.") (emphasis added); HAR § 13-1-37.  The communications here were permissible as they did not address the merits of the contested case or any issues of fact.  Given that this issue involves a question of administrative law, the appropriate standard of review of BLNR's denial of Kilakila's disclosure requests is abuse of discretion.  See Paul's Elec. Serv., 104 Hawaiʻi at 419, 91 P.3d at 501.

brackets omitted).

Therefore, we cannot conclude that BLNR abused its discretion.  However, we caution public officials and other interested parties that contacts of the type involved here carry significant risk of creating the appearance of impropriety, and--as Jacobson's filings indicate--of having an effect on the process.

## B.    BLNR properly analyzed the criteria under HAR § 13-5-30

Kilakila argues that BLNR's decision to grant the permit was not supported by the evidence and does not satisfy HAR § 13-5-30(c), which provides eight criteria that BLNR must consider prior to approving a permit.  Specifically, Kilakila argues that the ICA erred in affirming BLNR's findings under HAR § 13-5-30(c)(4), (5), and (6).  We address these three criteria below.

### 1.    BLNR did not err in determining that the ATST would not have a substantial adverse impact under HAR § 13-5-30(c)(4)

HAR § 13-5-30(c)(4) states:  "The proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region[.]" "Natural resource" is defined as "resources such as plants, aquatic life and wildlife, cultural, historic, recreational, geologic, and archeological sites, scenic areas, ecologically significant areas, watersheds, and minerals."  HAR § 13-5-2.

Kilakila argues that the ICA erred in "rubberstamp[ing]" BLNR's findings of no substantial adverse impact on existing natural resources, specifically cultural and visual resources. Kilakila argues that the ICA, the circuit court, and BLNR erred by failing to cite any evidence that the impacts to cultural resources would be less than substantial and that mitigation measures would reduce the intensity of the impacts. Kilakila further asserts that BLNR erred in disregarding certain findings in the FEIS to conclude that the ATST would not have a substantial impact on scenic vistas.

Despite Kilakila's contentions, we do not find that BLNR's treatment of the FEIS and its analysis under HAR § 13-5-30(c)(4) was clearly erroneous. See Save Diamond Head Waters, 121 Hawaiʻi at 25, 211 P.3d at 83 ("A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard[.]").

It is undisputed that the FEIS concluded that there would be adverse impacts on cultural and visual resources from the construction and operation of the ATST. The FEIS determined that there would be "major, adverse, short- and long-term, direct impacts" on cultural resources and that mitigation measures "would not reduce the impact intensity[.]" It also determined that the direct impact on visual resources within the Haleakalā National Park would be "moderate, adverse and long-term" and that

43

"[n]o mitigation would adequately reduce this impact."  From

outside the Park, the impact of building the ATST "would result

in minor, adverse and long-term impact to visual resources[,]"

and therefore "[n]o mitigation would be necessary."

Kilakila suggests that the FEIS findings required BLNR

to determine that HAR § 13-5-30(c)(4) was not satisfied.  While

BLNR was required to consider the findings in the FEIS, it was

not bound by these findings and still retained discretion over

its decision.  See Mauna Kea Power Co. v. Bd. of Land & Nat.

Res., 76 Hawai'i 259, 265, 874 P.2d 1084, 1090 (1994) (affirming

BLNR determination despite conflicting conclusions in EIS).  In

other words, BLNR was not required to conclude that the ATST

would not satisfy HAR § 13-5-30(c)(4) solely because the FEIS

determined there would be major adverse impacts on cultural

resources.  Rather, an environmental impact statement is "merely

an informational document," and its findings neither presume

approval nor denial of a conservation district use application.

Id.; see also HRS § 343-2 (defining "environmental impact

statement" as "an informational document").

As such, in making its decision to grant the permit,

BLNR properly considered the FEIS, along with the information

provided by the permit application, the site visits and maps, the

public hearing testimony, the contested case hearing testimony

and evidence, the hearing officer's recommendation, and other

44

documents.  See HAR §§ 13-5-31, 13-5-40 (1994), 13-1-28; see also
Camara v. Agsalud, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)
("[I]n deference to the administrative agency's expertise and
experience in its particular field, the courts should not
substitute their own judgment for that of the administrative
agency where mixed questions of fact and law are presented.  This
is particularly true where the law to be applied is not a statute
but an administrative rule promulgated by the same agency
interpreting it.") (citation omitted).

Next, Kilakila argues that BLNR did not sufficiently
explain how it reached its decision despite the conflicting
findings in the FEIS.  More specifically, Kilakila asserts that
BLNR should have provided "supporting analytical data" for its
decision, rather than "a perfunctory description or mere listing
of mitigation measures[.]"  Kilakila takes this language from
Makua v. Rumsfeld, in which the U.S. District Court for the
District of Hawaiʻi concluded that a supplemental environmental
assessment's finding of no significant impact on endangered
species "contain[ed] no analysis or evidence of the effectiveness
of [the] mitigation measures" and therefore was insufficient.
163 F. Supp. 2d 1202, 1218 (D. Haw. 2001).

In addition to not being binding on this court, Makua
is not analogous because the issue in that case was whether an
environmental impact statement should have been prepared.  Id. at

45

1216. Here, an environmental impact statement was completed, and BLNR subsequently determined "[b]ased upon the evidence and testimony presented in this case, and the files and records herein," that a permit approval was warranted. Furthermore, this court has never required an agency to provide "supporting analytical data" to uphold its findings. Instead, our court requires that "where the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clarity, giving some reason for discounting the evidence rejected." Waiāhole, 94 Hawaiʻi at 163-64, 9 P.3d at 475-76 (emphasis added).

We therefore consider whether BLNR articulated with reasonable clarity why the ATST would not result in a substantial adverse impact on natural resources, despite the apparently conflicting findings in the FEIS.

BLNR noted that "[t]he impacts of the ATST Project must be viewed in the context of the HO site[,]" which has "housed astronomy facilities since the 1950's and was specifically created for astronomy uses." There are eleven facilities currently located within the HO site, and the ATST would leave only one vacant location, the Reber Circle site.

Due to these existing facilities in the HO, the FEIS found that there would be "major, adverse, long-term, direct impacts" on cultural resources even under the No-Action

46

Alternative.  The No-Action Alternative refers to the scenario in which "no construction [of the ATST] would take place and operations [in the HO] would continue unaltered."  These impacts are almost identical to the impacts that would result from the construction of the ATST, which the FEIS described as "major, adverse, short- and long-term, direct."  Therefore, regardless of whether or not the ATST was constructed, the FEIS determined that there would be major, adverse impacts on cultural resources.

Consistent with this finding in the FEIS, BLNR concluded that "because of the past construction of man made structures[,]" the ATST's additional impact on cultural resources would be "incremental[.]"  BLNR concluded that the impact on visual resources would be similarly incremental:  "[T]he ATST would be visible to a point of co-dominance with other nearby structures" and "would not substantially alter the existing visual character visible in any view."  In other words, BLNR concluded that the ATST would have an impact on cultural and visual resources, but given the existing buildings in the HO, BLNR concluded that the impact would not be substantial.

BLNR also considered mitigating measures when determining whether ATST would have a substantial adverse impact on natural resources.  In the CDUA, UHIfA committed to mitigation measures "intended to reduce the duration, intensity or scale of impacts or to compensate for the impact by replacing or providing

47

substitute resources or environments."  The measures specifically directed at reducing cultural and visual impacts included creating a Native Hawaiian Working Group to address issues concerning Native Hawaiians, setting aside area within the HO site solely for use by Native Hawaiians, removing unused facilities, and decommissioning the ATST within 50 years.

Other mitigating effects included the expected scientific, economic, and educational benefits of the ATST.  BLNR determined that the ATST would result in "the advancement of scientific knowledge," as it would "significantly increase understanding of the Sun . . . and help scientists predict major solar events having a profound impact on life on Earth." Additionally, BLNR noted that "[j]obs and revenue for the economy would be created on Maui," including job opportunities in the "clean high-tech industry."  It also concluded that "[e]ducational opportunities would be created for students at the Maui Community College as well as for native Hawaiian astronomers" to "foster a better understanding of the relationships between native Hawaiian culture and science."[21]

---

[21]    Specifically, Maui College submitted a "mitigation proposal," which requested funding for:

> (1) development and implementation of an innovative math and science curriculum and program based on Hawaiian cultural knowledge and worldview; (2) building up relevant coursework and dedicated programs at Maui College; (3) significantly increasing the number and retention of native Hawaiian students in

(continued...)

Additionally, BLNR noted that the ATST was designed to be as small as possible while still being consistent with scientific needs. It also added permit conditions that would mitigate impacts on cultural resources, including:

> 17. Within 2 years of completion of the construction of the ATST facility, Kilakila may require the construction and consecration of a new ahu[22] in addition to the two currently present. Upon request by Kilakila, UHIfA will work with Kilakila, the Cultural Specialist and the Native Hawaiian Working Group to select an appropriate location for the new ahu which shall be built and consecrated in [a] similar manner to the prior ahu;
> . . . .
> 20. In order to protect the traditional and customary rights exercised in the HO site, during construction of the ATST Project and after, UHIfA shall allow access to the two ahu for the reasonable exercise of traditional and customary practices of native Hawaiians to the extent feasible and safe, as determined by the Cultural Specialist and the ATST Project construction site supervisor.

Based on this analysis, BLNR concluded that "[t]he proposed land use, when considered together with all minimization and mitigation commitments discussed . . . and with the additional conditions contained in this Decision, will not cause

_____

[21](...continued)
> Science, Technology, Engineering and Math ("STEM") courses and programs at Maui College; and (4) cultivating and developing an experienced, highly skilled native Hawaiian workforce for STEM related industries and careers.

The National Science Foundation adopted the proposal and "will make $20 million ($2 million per fiscal year for ten years) available to support this educational initiative to address the intersection between traditional native Hawaiian culture and science and to foster a better understanding of the relationships between native Hawaiian culture and science."

[22]     An "ahu" is defined as an altar or shrine. Pukui & Elbert, Hawaiian Dictionary 8 (2nd ed. 1986). In 2005, UHIfA contracted with Native Hawaiian stonemasons to erect a west-facing ahu within the HO site. In 2006, "in the spirit of makana aloha for the ATST Project," UHIfA contracted with the same stonemasons to erect an east-facing ahu in the HO site.

49

substantial adverse impact [sic] to existing natural resources within the surrounding area, community or region."

In reviewing BLNR's findings under HAR § 13-5-30(c)(4), we first consider BLNR's reliance on the "incremental" nature of the ATST Project. We agree with Kilakila that BLNR does not have license to endlessly approve permits for construction in conservation districts, based purely on the rationale that every additional facility is purely incremental. It cannot be the case that the presence of one facility necessarily renders all additional facilities as an "incremental" addition.

In spite of our concerns, we are not "left with a firm and definite conviction" that BLNR made a mistake in reaching its conclusion given the highly specific circumstances of this case. Brescia v. N. Shore Ohana, 115 Hawai'i 477, 491-92, 168 P.3d 929, 943-44 (2007) ("An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantive evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.") (quoting Poe v. Hawai'i Labor Relations Bd., 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004)).

BLNR reviewed the ATST Project within the context of a single, highly developed 18.166-acre area within a much larger conservation district, and which involves a use (astromony) which is specifically permitted in the general subzone of the

50

conservation district. The FEIS also determined that the level of impacts on natural resources would be substantially the same even in the absence of the ATST. In addition, UHIfA committed to mitigation measures directed at reducing the cultural and visual impacts on natural resources. See HAR § 13-5-42(a)(9) (1994) ("All representations relative to mitigation set forth in the accepted environmental assessment or impact statement for the proposed use are incorporated as conditions of the permit[.]"); see also Morimoto v. Bd. of Land & Nat. Res., 107 Hawaiʻi 296, 303, 113 P.3d 172, 179 (2005) (concluding that BLNR properly considered mitigation measures when evaluating HAR § 13-5-30(c)(4)). Taken cumulatively, BLNR "articulate[d] its factual analysis with reasonable clarity" why the ATST would not result in a substantial adverse impact on natural resources. Waiāhole, 94 Hawaiʻi at 164, 9 P.3d at 476.

Lastly, Kilkila argues that BLNR made its findings under HAR § 13-5-30(c) based on "unwritten criteria," referring to BLNR's mention of the ATST's scientific, economic, and educational benefits in its findings under HAR § 13-5-30(c)(4). However, there is no regulation suggesting that BLNR could not consider benefits related to HAR § 13-5-30(c) when approving a permit. HAR § 13-5-30(c) states, "In evaluating the merits of a proposed land use, the department or board shall apply the following criteria[,]" but the statute and agency regulations

concerning conservation districts do not suggest that scientific, economic, and education benefits are not relevant.  Rather, they suggest the opposite.

The purpose of HAR § 13-5-30(c) and the other conservation district regulations is "to regulate land-use in the conservation district for the purpose of conserving, protecting, and preserving the important natural and cultural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety, and welfare."  HAR § 13-5-1 (1994).  The statute governing the conservation districts, HRS § 183C-1 (Supp. 1996), similarly states:

> The legislature finds that lands within the state land use conservation district contain important natural resources essential to the preservation of the State's fragile natural ecosystems and the sustainability of the State's water supply.  It is therefore, the intent of the legislature to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare.

BLNR is therefore unequivocally tasked with protecting natural and cultural resources through "appropriate management and use to promote their long-term sustainability and the public health, safety, and welfare."  HRS § 183C-1; HAR § 13-5-1.  The consideration of relevant scientific, economic, and educational benefits of the ATST within the context of the HO does not conflict with this, as these benefits impact long-term

52

sustainability and public welfare.[23]  See Black's Law Dictionary 1828 (10th ed. 2014) (defining "public welfare" as "[a] society's well-being in matters of health, safety, order, morality, economics, and politics").

The cases cited by Kilakila are not applicable here, where an agency has evaluated considerations relevant to--rather than instead of--the criteria set forth in the applicable regulations.  See Aluli v. Lewin, 73 Haw. 56, 58, 828 P.2d 802, 803 (1992) (agency had no rules governing the issuance of permit); Mahuiki v. Planning Comm'n, 65 Haw. 506, 519, 654 P.2d 874, 882 (1982) (court found no evidence in the record supporting agency finding); Ainoa v. Unemployment Compensation Appeals Div., 62 Haw. 286, 293, 614 P.2d 380, 385 (1980) (agency failed to comply with existing requirements); Aquiar v. Hawaiʻi Hous. Auth., 55 Haw. 478, 498, 522 P.2d 1255, 1268 (1974) (same).

Therefore, while BLNR could certainly not rely solely on the scientific, economic, or educational benefits of the ATST, BLNR did not improperly consider benefits relevant to the ATST's

---

[23]     We agree with Kilakila that BLNR should not have considered that "[j]obs and revenue for the economy would be created on Maui" under 13-5-30(c)(4) inasmuch as jobs unrelated to the preservation and advancement of natural or cultural resources are irrelevant.  However, as BLNR properly considered the scientific and educational benefits in addition to the findings in the FEIS and numerous other mitigating measures, we conclude that this error was harmless.  See Korean Buddhist Dae Won Sa Temple, 87 Hawaiʻi at 241-42, 953 P.2d at 1339-40 (holding that the Director of the Department of Land Utilization's improper consultation of evidence outside the record was harmless error because "the outcome of the proceedings would not have been altered").

expected impact on existing natural resources under HAR §
13-5-30(c)(4).  See Morimoto, 107 Hawaiʻi at 303, 113 P.3d at 179
(allowing BLNR to consider mitigation measures even though not
explicitly mentioned in HAR § 13-5-30(c)).

Accordingly, we find that BLNR's conclusion that the
ATST satisfied the criteria under HAR § 13-5-30(c)(4) was not
clearly erroneous, though we emphasize that review of future BLNR
decisions will be "dependent upon the facts and circumstances of
the particular case."  Save Diamond Head Waters, 121 Hawaiʻi at
25, 211 P.3d at 83 (quoting Del Monte Fresh Produce, 112 Hawaiʻi
at 499, 146 P.3d at 1076).

2. **BLNR did not err in interpreting HAR § 13-5-30(c)(5) to include the area within the HO**

HAR § 13-5-30(c)(5) states:  "The proposed land use,
including buildings, structures, and facilities, shall be
compatible with the locality and surrounding areas, appropriate
to the physical conditions and capabilities of the specific
parcel or parcels[.]"  Kilakila argues that the ICA erred in
affirming BLNR's interpretation of "locality and surrounding
areas" in HAR § 13-5-30(c)(5) as the immediate vicinity of the
proposed ATST site.  Rather, Kilakila asserts that "surrounding
areas" includes Haleakalā National Park, and that there is no
evidence that the ATST is compatible with the Park.

In its consideration of HAR § 13-5-30(c)(5), BLNR

54

focused on the permitted land use in the HO site:

> The HO site was specifically set aside for observatory site purposes under Executive Order No. 1987. Astronomical and observatory facilities have existed on the HO site since 1951. The ATST Project includes the construction of astronomical facilities which are compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel.

Because it did not mention areas outside of the HO site, BLNR necessarily interpreted "locality and surrounding areas" as the areas within the HO site.

We defer to BLNR's interpretation unless it was plainly erroneous or inconsistent with the underlying legislative purpose. See Kaleikini v. Yoshioka, 128 Hawaiʻi 53, 67, 283 P.3d 60, 74 (2012) ("An agency's interpretation of its own rules is generally entitled to deference."); In re Waiʻola O Molokaʻi, Inc., 103 Hawaiʻi 401, 425, 83 P.3d 664, 688 (2004) (stating that courts do not defer to agency interpretations that are "plainly erroneous or inconsistent with the underlying legislative purpose").

The ATST will be located in a small subsection of the HO site, which is a clearly defined, highly specialized area. The HO site's 18.166 acres were specifically set aside for observatory site purposes by Governor Quinn in 1961, and this site is the only site at Haleakalā used for these purposes. Since Governor Quinn's designation, the HO has been considerably developed by the construction of numerous observatories and other

55

astronomical research facilities.  The ATST will be the next facility built within the site's set boundaries and will fulfill the site's designated purposes.  As such, it was not plainly erroneous to interpret "locality" as the location of the ATST and "surrounding areas" as the HO site, due to the site's unique characteristics and history.

Kilakila argues that BLNR recognized that Haleakalā National Park was part of the "surrounding area" based on a quote from the BLNR order approving the permit.  In describing a site visit, BLNR states:

> The parties and Hearing Officer Jacobson visited the site of the proposed ATST and the surrounding area on July 15, 2011.  They observed the views from the area, the proximity of the structures to each other, the ahu in the HO site and views from them, the view from Pu'u 'Ula'ula, the view from Haleakalā National Park Visitor Center and the area around the Visitor Center, the view from the road driving up to the HO site, and the historic sites in the HO site.

This quote does not demonstrate any such recognition, as the second sentence appears to simply be listing locations without any reference to the first sentence's use of "surrounding area."  Regardless, the fact that BLNR used the term "surrounding area" in describing a site visit does not bind BLNR to this exact definition when interpreting HAR § 13-5-30(c)(5).

Therefore, the ICA did not err in affirming BLNR's conclusions under HAR § 13-5-30(c)(5).

3.   **BLNR did not err in concluding existing aspects of the land would be preserved under HAR § 13-5-30(c)(6)**

HAR § 13-5-30(c)(6) states: "The existing physical and environmental aspects of the land, such as natural beauty and open space characteristics, will be preserved or improved upon, whichever is applicable[.]"  Kilakila argues that HAR § 13-5-30(c)(6) is not satisfied because UH admitted that the ATST does not improve natural beauty or open space characteristics, and because "BLNR failed to point to any evidence that ATST preserves natural beauty and open space[.]"

In its consideration of HAR § 13-5-30(c)(6), BLNR noted that "[t]he ATST will not enhance the natural beauty or open space characteristics of the HO site."  However, because "[t]he HO site contains various astronomy facilities, including support buildings, roads and parking lots[,]" and "the proposed ATST is similar to existing facilities," BLNR concluded that "[t]he ATST will be consistent with and will preserve the existing physical and environmental aspects of the land."  In other words, BLNR relied on similar reasoning as in HAR § 13-5-30(c)(4), which focused on the ATST within the context of the HO site.  Because the ATST will be located within the HO site and among other pre-existing facilities, the ATST will maintain, or "preserve," the "existing physical and environmental aspects of the land[.]"

Additionally, BLNR considered numerous mitigation

57

commitments in the CDUA, which were designed to mitigate impacts on biological resources.  The measures included consulting a wildlife biologist, monitoring invertebrates, flora, and fauna, and following washing and inspection protocol to prevent the introduction of alien invasive species.  BLNR also determined that "[l]ittle to no impacts are anticipated to the topography, geology, soils, water resources or air quality as a result of the ATST Project and as such no mitigation is required."

Therefore, similar to its analysis of HAR § 13-5-30(c)(4), BLNR articulated with "reasonable clarity" why the ATST would preserve the existing physical and environmental aspects of the land.  See Waiāhole, 94 Hawaiʻi 97 at 164, 9 P.3d at 476.  Because we are not "left with a firm and definite conviction that a mistake has been made," we do not find BLNR's findings regarding HAR § 13-5-30(c)(6) clearly erroneous, and we affirm the ICA on this point.  Brescia, 115 Hawaiʻi at 492, 168 P.3d at 944.

## C.   The ATST is not Inconsistent with the Purposes of Conservation Districts and General Subzones

Kilakila argues that the ICA erred in determining that the ATST is consistent with the purposes of the conservation district because of its "unprecedented height, mass, and scale; industrial appearance; use of hazardous materials, location in 'Science City', location in an area that is already 40%

58

developed, and substantial impacts[.]" The issue presents a mixed question of fact and law, and is therefore "reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." Save Diamond Head Waters, 121 Hawai'i at 25, 211 P.3d at 83 (quoting Del Monte Fresh Produce, 112 Hawai'i at 499, 146 P.3d at 1076).

To grant a CDUP in a conservation district, HAR § 13-5-30(c)(1) requires that the proposed land use is "consistent with the purpose of the conservation district[.]" Additionally, HAR § 13-5-30(c)(2) requires that the proposed land use must be "consistent with the objectives of the subzone of the land on which the use will occur[.]" The ATST must therefore be consistent with the purposes of general subzones and conservation districts.

A general subzone seeks to "designate open space where specific conservation uses may not be defined, but where urban use would be premature." HAR § 13-5-14(a). HAR § 13-5-24 together with HAR § 13-5-25 provide guidance on appropriate land uses in general subzones. HAR § 13-5-24 lists "astronomy facilities under an approved management plan" as one of the allowable uses under a resource subzone. HAR § 13-5-25 states that "[i]n addition to the land uses identified [for general subzones], all identified land uses . . . for the . . . resource

59

subzones also apply to the general subzone, unless otherwise noted." Together, these rules specifically permit the construction of astronomy facilities and do not specify a limit as to size, appearance, or other characteristics. As an astronomy facility, the ATST falls under an appropriate use and is not inconsistent with the purposes of a general subzone.

Additionally, as discussed above, the ATST complies with the broad purposes set out in the statute and agency rules regulating conservation districts. See HAR § 13-5-1 (directing BLNR to manage natural and cultural resources "to promote their long-term sustainability and the public health, safety, and welfare"); HRS § 183C-1 (stating that the legislature created conservation districts "to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare").

In sum, BLNR did not erroneously conclude that the ATST was consistent with the purposes of both general subzones and conservation districts.

### IV. Conclusion

For the reasons stated above, BLNR properly granted CDUP MA-11-04 for construction of the ATST. The permit did not suffer from the procedural infirmities of prejudgment or improper ex parte communications, BLNR made valid findings under the

applicable permit criteria, and the ATST is not inconsistent with

the purposes of the conservation district.  Therefore, the ICA's

November 13, 2014 Judgment on Appeal is affirmed.

David Kimo Frankel and
Sharla Ann Manley
for petitioner
Kilakila ʻO Haleakalā

Linda L.W. Chow
for respondents Board of
Land and Natural Resources,
Department of Land and Natural
Resources, and Suzanne Case,
in her official capacity as
Chairperson of the Board of
Land and Natural Resources

Lisa Woods Munger, Lisa A.
Bail, Kimberly A. Vossman,
and Christine A. Terada
for respondent University
of Hawaiʻi

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

